## ROBERTI et al. v. JONAS et al.

(District Court, S. D. California, S. D. June 3, 1924.)

No. G–79.

1. Patents ⚫⟼328—1,180,432, claims 2 and 3, held valid and infringed.
   Roberti patent, No. 1,180,432, claims 2 and 3, relating to construction of mattresses, *held* valid and infringed.

2. Patents ⚫⟼112(4)—Fact of securing patent does not establish noninfringement.
   The fact that defendant secured a patent does not establish that his combination does not infringe prior patent.

3. Patents ⚫⟼185—Improvement does not carry with it right to make use of substance of prior invention.
   That subsequent patentee is entitled to be protected in an improvement does not carry with it right to make use of prior invention.

4. Patents ⚫⟼312(3)—Defense in infringement suit that plaintiffs improperly made use of invention of another must be clearly established.
   In infringement suit, a defense that plaintiffs improperly made use of invention of another as basis for patent application must be clearly established by satisfactory evidence.

In Equity. Suit by August Roberti, Jr., and another, against J. H. Jonas, doing business under the firm name of J. H. Jonas & Sons, and others. Interlocutory decree for plaintiffs.

⚫⟼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Frank L. A. Graham and Ford W. Harris, both of Los Angeles, Cal., for plaintiffs.

Raymond I. Blakeslee and J. Calvin Brown, both of Los Angeles, Cal., for defendants.

JAMES, District Judge. Plaintiffs here, alleging themselves to be the joint inventors and owners of rights secured to them under letters patent No. 1,180,432, issued April 25, 1916, sue to restrain the defendants from infringing and to have an accounting and damages.

The art involved is that of the construction of bed mattresses, which are commonly made by the inclosing of hair, wool, cotton, or some other soft material between upper and lower fabric covers, with side boxing of like material. The evidence in the case discloses that it is necessary that ties of some sort of cord shall be run through the mattress from cover to cover at intervals, which ties are of uniform length and customarily divide the top and bottom covers into rectangles or "biscuits." By the use of these ties, uniform thickness is secured and the filling of the mattress is less likely to become displaced and create unevenness. These and other advantages have made the use of ties indispensable to the manufacturer of a marketable mattress.

The earlier methods included the fastening of the ends of the ties on the outer covers of the mattress, producing what is known as "tufts." It was recognized that it was desirable to dispense with these tufts, because they furnished a lodging place for dust or dirt and added to the difficulties of cleaning the mattress. To obviate this objectionable feature, the ingenuity of mattress makers was employed in the direction of discovering some means by which the ties could be placed without having a surface tuft on the covering of the mattress. Busche, in 1904, in the art of cushion making, patented a method of using a button with a shank eye or thread holes, which he placed between the outer cushion cover and a retaining strip sewn to the under side of the cover. Micon, in January, 1915, secured a patent upon a combination including the subdividing of the interior of the mattress into compartments, the divisions being formed by strips or tabs fastened to the inner side of the upper and lower covers, the flap from above meeting the flap from below and being tied to it after each compartment had been filled. Other patents have been exhibited, showing advances made in the art, including reinforcing strips across the inner sides of the covers, as in the Van Vorst patent of May 4, 1915. In none of the early combinations exhibited, either by the patents referred to or others introduced in evidence, could the complete operation of inserting and fastening the ties in a tuftless mattress be done after the filling had been placed between the covers provided for it.

Plaintiffs, in their combination, used inner tabs stitched to the inside of the mattress covers, and added an eyelet in the outside mattress covers through which to insert a mattress needle carrying the tie cord. The tabs were so fashioned that, when the filling was pushed into the mattress, it would press the tabs squarely against the eyelet, so that when the needle was inserted it necessarily passed through the tab attached to both the upper and lower cover. The method was, after

running the needle through from side to side, to bring it back, taking care that it did not pass through the same point in the tab on the return passage as on the first. Having, then, both ends of the tie cord on the outside of the initial eyelet, a knot would be tied, which, upon being pulled through the eyelet, would in turn pull the ends of the tabs toward each other and into the mattress filling. When the desired spacing between the upper and lower mattress cover had been obtained, the tie cord extending from the eyelet would be cut, and the cut end pushed through out of view. The general advantageous results obtained would be a completed mattress without tufts, in which the filling could be completely placed before the insertion of any ties, and in which ties could be affixed and fastened easily and quickly.

There was nothing new or novel in the use of inner tabs or flaps sewn to the inside covers; there was—and the history of the art clearly shows this to be true—novelty in the use of the eyelet in conjunction with the inner tabs or flaps. Eyelets were old, but not in the same relation. Their use in the mattress combination as embraced in plaintiffs' claims was not a matter of obvious expedient, apparent to persons skilled in the art; else why, in view of the former cumbersome methods of fastening ties by hand on the inside of the unfilled mattress tick, had they not been used before? The fact that mattresses in which the eyelet is used appear to enjoy a preferential demand on the market is ample proof that they represent a pronounced advance in mattress manufacture.

Defendants, however, claim that in the making of their mattresses they use a combination essentially different from that of the plaintiffs. They exhibit letters patent No. 1,421,274, issued on June 27, 1922, to H. J. Malerstein, who is a relative of his codefendants, and claim that their mattresses are made according to that design strictly. Malerstein made use of strips sewn to the inner side of the mattress covers, to which he fastened his ties. These strips crossed at right angles and were stitched to the cover at each end, but were loose between the stitching points, so that, when the tie was attached, the strips would depend into the mattress filling. He used the eyelet, however, placing it above (or under) the point where the strips crossed, and inserted his cord tie therethrough. Instead of piercing the cloth strips, as the Robertis did, he passed the cord on either side of the crossed strips. The only physical difference between his combination, or the mode of placing his ties, was in the construction of the strips and the putting of the tie on either side of the crossing point, instead of through the fabric.

[1-3] I am of the opinion that plaintiffs' patent covers a mattress whereby tabs or their equivalents are used on the inner covers of the mattress, and through which, by means of an eyelet placed in such covers, ties are inserted and fastened. I believe that claims 2 and 3 are infringed by the mattress manufactured by the defendants under the Malerstein design. The plaintiffs have not so limited the tabs used as to define them to be of particular size, shape, or kind of material, and are entitled to be protected against equivalents within a reasonable range. The strips used by Malerstein perform precisely the same func-

tion in substantially the same way as the Roberti tabs. They may be stronger, by reason of their double attachment, but they are stitched to the covers and do furnish the support for the ties, altogether similar to the Roberti tabs. Malerstein did not dispense with the eyelet, and without it his strips could not have been tied without resorting to some of the older and before-mentioned cumbersome methods. It appears fairly evident that the effort of Malerstein was to take advantage of the eyelet feature of the Robertis' patent; at the same time he endeavored to make such a change in the inner attachment of the tabs as would aid his claim that there was no substantial identity to claim infringement upon. I do not think that he has succeeded in doing this. The fact that he secured a patent does not establish that his combination does not infringe the rights granted to the Robertis. The Patent Office may have considered that there was some improvement worked in his combination over that of the Robertis; but, if so, he is to be protected only in the improvement, which does not carry with it a right to make use of the substance of the prior invention. If this were not true, then a patent right would be practically without value, and offer no security to the inventor.

The defense that plaintiffs were not the first inventors of their combination, because of the discovery and disclosure of Daniel in 1913, and Avril in 1916, should be decided against the defendants. Daniel filed his petition for a patent in the Patent Office in February, 1913. His design covered the construction of a mattress without eyelets. At intervals on the inner side of the top and bottom covers he stitched strips continuously across his mattress, which were loose between the lines of stitching. He placed his ties by working a needle carrying the tie cord through the outer cover and inner strip, and through the lower cover and inner strip, bringing the needle back through the same hole of the outer cover below, working it through a different place in the two inner strips, and out the same hole in the upper strip. He then tied his knot and worked the knot through the hole in the upper cover, and worked the threads of the upper cover together, so that the hole would not be visible. Against this application the Examiner particularly cited the Busche patent, and Daniel abandoned the further prosecution of his application. The Daniel disclosure, without the eyelet, would not affect the novelty of the Roberti combination.

[4] Joseph Avril made an application on December 1, 1916, for a patent, and the disclosure there made is also urged in defense. It is to be noted that this application was filed about eight months after the patent of plaintiffs had been granted, and over a year after plaintiffs' application was made, which was of date February 18, 1915. Evidence was introduced with the intent to prove that Avril had invented and manufactured a mattress using eyelets and tabs, prior to the time that plaintiffs claim to have originated their combination, and, further, that the Avril mattress had been examined by one of the Robertis; the inference suggested being that plaintiffs had not in fact made the invention claimed, but had improperly made use of the invention of another as a basis for their patent application. A defense of this kind, as I understand the law, must be clearly established by

satisfactory evidence, and, viewing all of the testimony given, this issue, I think, under that measure of proof, must be decided against the defendants. The preliminary statement of Avril, made to the Patent Office, which presumably was not disclosed to the plaintiffs until after they had made a like statement, showed that Avril claimed his invention to have been made at a time subsequent to that shown in the preliminary statement of the plaintiffs. Avril had made up an earlier design and filed on it in July, 1916. In that design he used the eyelet with the tab attached at one end only; whereas, in the application of December, 1916, he attempted to differentiate from the Roberti patent by attaching his tab at two points and tying through or around the loop, using nevertheless the eyelet.

That the Robertis were joint inventors I think is fairly established by the evidence. The issue as to the alleged unfair competition, arising by use of claimed similarity of the names used by the defendants on their product to those of plaintiffs, I understand the plaintiffs to have abandoned.

From the conclusions expressed it follows that an interlocutory decree should be entered, determining the validity of the patent of plaintiffs as to the claims specified, and that the defendants have been guilty of infringement, by reason of which plaintiffs have suffered damage. The decree will provide, further, for the issuance of a writ of injunction to prevent further acts of infringement, and for a reference to a master to have the amount of the damages ascertained and reported.